FILED
03/01/2024
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE
### Assigned on Briefs October 25, 2023 at Knoxville

## STATE OF TENNESSEE v. MICHAEL CLARENCE CRAFT, JACKIE DEWAYNE DAVIS, AND ZACHARY STUART TABLACK

**Appeal from the Circuit Court for Montgomery County**
**Nos. 63CC1-2020-CR-371, 63CC1-2020-CR-386, 63CC1-2020-CR-387**
**Robert T. Bateman, Judge**

_____

### No. M2022-01720-CCA-R3-CD

_____

Michael Craft, Jackie Dewayne Davis, and Zachary Stuart Tablack, collectively "Defendants," pled guilty as Range I offenders to two counts of voluntary manslaughter with the issue of judicial diversion and, alternatively, the length and manner of service of their sentences, to be determined by the trial court. Following a sentencing hearing, the court sentenced each Defendant to concurrent terms of six years' incarceration. On appeal, Defendants Davis and Tablack claim that the trial court erred by denying judicial diversion, by denying probation, and by sentencing them to the maximum sentence. Defendant Craft claims that the court erred by imposing the maximum sentence. Discerning no reversible error, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TOM GREENHOLTZ and MATTHEW J. WILSON, JJ., joined.

Jacob W. Fendley, Clarksville, Tennessee, for the appellant, Michael Clarence Craft.

John D. Parker, Clarksville, Tennessee, for the appellant, Zachary Stuart Tablack.

Stephanie Ritchie Mize (on appeal and at plea hearing) and Terria Blunt (at sentencing), Clarksville, Tennessee, for the appellant, Jackie Dewayne Davis.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior, Assistant Attorney General; and Robert J. Nash, District Attorney General, for the appellee, State of Tennessee

# OPINION

Defendants were indicted in May of 2020 on two counts of first degree premeditated murder and one count of reckless endangerment involving a deadly weapon. Pursuant to a plea agreement, each Defendant pled guilty to two counts of voluntary manslaughter, and the reckless endangerment charges were dismissed. The parties agreed that Defendants would be sentenced as Range I offenders and that the sentences would be served concurrently; the length of the sentences and whether alternative sentencing or diversion was appropriate would be determined by the trial court. Defendant Craft's attorney offered the following factual basis at the plea submission hearing:

> [T]he Tilted Kilt was hosting a Bike Night event. All three [D]efendants were at the Tilted Kilt. They arrived at different times. [Defendant] Tablack, on his way to the Tilted Kilt, stopped by at LongHorn.[1] There was some contact between [Defendant] Tablack and Mr. Ramsey, one of the decedents in this case. After that contact, Mr. Ramsey called Mr. Allgood, the other decedent in this case, who arrived at the LongHorn, we think, about 45 minutes later.
>
> Both decedents exited the LongHorn []. [Defendant] Tablack was on his motorcycle to the side of the sidewalk. The decedents approached [Defendant] Tablack. [Defendants] Craft and Davis were approaching from another angle. Witnesses say Mr. Ramsey had a gun out on his exit -- well, at least one witness says he had a gun out by his side upon his exit. [Defendant] Tablack observes Mr. Ramsey pull his gun during this argument that got heated. Mr. Allgood approached [Defendant] Tablack. There was a physical scuffle between the two of them. Mr. Allgood was put on the ground.
>
> At that point Mr. Ramsey, it is believed by [D]efendants, began to raise his firearm. Before he could raise it all the way, [Defendant] Craft opened fire. He shot Mr. Ramsey three times. Mr. Ramsey fell down. [Defendant] Davis dropped to a knee and may or may not have fired a shot. A shell casing was recovered on the scene consistent with the firearm with his DNA on it.
>
> Mr. Allgood moved to Mr. Ramsey, retrieved the firearm that Mr. Ramsey had while he was dying, and began to open fire as well. Defendant Tablack at that point, we believe, was struck in the leg with a bullet and

---

[1] LongHorn Steakhouse will be referred to as LongHorn.

returned fire to Mr. Allgood, striking him and killing him. All three [D]efendants exited the scene immediately.

The State agreed that this is what the proof at trial would show due to the death of one witness, the inability to locate a second witness, and a third witness becoming incapacitated. All three Defendants agreed that the facts presented by Defendant Craft's attorney were true. After confirming that each Defendant was pleading guilty intelligently and voluntarily and that each understood his rights, the trial court accepted the guilty pleas and set a date for the sentencing hearing.

The sentencing hearing for Defendants was held on November 21, 2022. The Presentence Report for Defendant Craft was entered as Exhibit 1, the Presentence Report for Defendant Davis was entered as Exhibit 2, and the Presentence Report for Defendant Tablack was entered as Exhibit 3. The State called Robert Allgood, the older stepbrother of the victim, John Allgood. He stated that John Allgood joined the Navy after high school, completed two tours of duty, and moved to Detroit. After their father passed away, John Allgood moved back to Clarksville and became the primary caregiver for their mother and their younger sister, who used a wheelchair.

Defendant Tablack called Novelle Flippen, the Classification/Disciplinary Sergeant of the Montgomery County Sheriff's Department. Sergeant Flippen stated that there was an incident at the jail involving Defendant Tablack. After watching the video of the incident, she determined that another inmate approached Defendant Tablack and swung at him. She said that Defendant Tablack "gained control and just held the other inmate in a lock." After the inmates were separated, the other inmate swung at Defendant Tablack again and a fight occurred. Based upon viewing a recording of the altercation, Sergeant Flippen described Defendant Tablack's demeanor as not wanting to fight. She described Defendant Tablack as "an inmate that stays out of the way and does what he's supposed to do in jail."

Defendant Tablack next called Probation/Parole Officer Taylor Doyle, who prepared the presentence report and needs assessment concerning Defendant Tablack. Officer Doyle said her statement in the needs assessment that Defendant Tablack's "motivation involves anger, retaliation, vengeance" was based totally on the type of offense for which he was convicted. She said she had no concerns about Defendant Tablack based upon her interview of him.

Kathryn Ann Macauley, Defendant Tablack's mother, said that Defendant Tablack planned to go to school in Georgia to train as a crane operator. She said that he had been accepted and was scheduled to begin on January 17, 2023, and that he would live with her in Palmyra. She said Defendant Tablack had been in jail for two and one-half years. She

said he had a five-year-old son and that, before being incarcerated, he had equal parenting rights, was current on his child support obligations, and cared for his son every other week.

Craig Dean Vincent testified that he owned a construction company that built bridges. He said that he had a position available for Defendant Tablack. He said that he had no concerns about Defendant Tablack's working for him.

Defendant Tablack made an allocution. He described what happened as "absolutely horrible" and said the entire incident "stemmed from a misunderstanding." Defendant Tablack said he had known Mr. Allgood since Defendant Tablack was twenty years old. He said he was headed to "Bike Night" at a bar called the Tilted Kilt. On the way, he saw a motorcycle parked at LongHorn with a "diamond 1 percent sticker." He said he went inside LongHorn because he was curious about which club the rider of the bike belonged. He said that he saw two couples at a table and that one man at the table was a "full patch member." He said that he was a "probationary member" and that it would be "absolute disrespect not to acknowledge him." He said that he tapped two times on the man's shoulder and walked out without saying anything; he noted that the man said something to him and that, although he "wasn't really clear" on what the man said, it did not seem to be aggressive. Defendant Tablack got back on his bike and headed for the Tilted Kilt. He said Defendant Davis arrived at the Tilted Kilt about ten minutes after he arrived. Defendant Davis asked him if he saw the bike at LongHorn, and Defendant Tablack said that he had been inside LongHorn and had seen a "[l]ittle, short guy, member of the Kinfolks, with dark brown hair." Defendant Davis knew who he was and said his nickname was "Jimbo." Defendants Tablack and Davis rode to LongHorn but returned to the Tilted Kilt without going inside LongHorn.

Defendant Tablack said that they were standing in the parking lot of the Tilted Kilt when Defendant Craft arrived. He said Defendants Davis and Craft went inside the Tilted Kilt while he remained by the bikes talking to some people. He said that, when Defendants Davis and Craft came back outside, it was still daylight and that they decided to leave. As they were leaving, another Kinfolk member pulled into the back parking lot of LongHorn. After Mr. Allgood and Mr. Ramsey exited LongHorn, Defendants Davis and Craft drove their bikes over to where Mr. Allgood's and Mr. Ramsey's bikes were parked. Defendant Tablack said he did not go over because he was a probationary member and not allowed to be present for a conversation between full patch members. Defendant Tablack said he drove to the front of LongHorn and was turning around when Mr. Allgood and Mr. Ramsey came around the corner. He said Mr. Ramsey had a firearm in his hand and was walking towards him. Defendant Tablack put his kickstand down and got off his bike. He said he could not hear what Mr. Allgood and Mr. Ramsey were saying because he had his helmet on.

- 4 -

Defendant Tablack said Defendants Davis and Craft came around the corner, and everyone began arguing and telling Mr. Ramsey to put his gun down. Defendant Tablack described what happened as follows:

[Mr.] Allgood is almost screaming at him saying, "brother, look where we are at. Why the hell you got your gun out." Sorry for my language. It's getting pretty aggressive, to the point where I'm getting mad that he's got the gun out. And [Mr.] Allgood is telling me to shut up because I'm a probate, and he's like, "you're not allowed to be talking to him." At the time I didn't know this, but Mr. Ramsey was considered a nomad, and a nomad to me is a regional ranking officer, which means he's way above a chapter president, so on and so forth.

[Mr.] Allgood -- me and [Mr.] Allgood start arguing. [Mr.] Allgood approaches me, and he pushes me. I push him back. He goes to grab my cut and pulls it. When he does, I use my helmet and headbutt him right in the nose, and he falls down. The moment all that started happening, at some point gunfire erupted. I don't know who shot first or what happened in that situation, but gunfire went off.

My visor had [fallen] off when I hit him with my helmet when he pulled in towards me. When the gunfire erupted, I had hit the ground. I got up. I had my visor in my left hand. I go to get on my bike. My bike is facing towards out back. Okay. I put the visor underneath my left hand. [Defendants] Craft and Davis, they go back towards their bikes, and I'm trying to start my bike. And my bike is not starting. It ends up being a kill switch that I had hit when they had -- when I had seen him carrying a gun. I had to flip it back to start the bike.

I see [Mr.] Allgood walking towards the firearm that is on the ground that Mr. Ramsey had dropped. I get off my motorcycle, and I go to the front of my bike. And I'm telling him, "[D]on't pick the gun up." And I'm screaming at him. And he doesn't know who I am, because if -- I feel like . . . if I would have just [taken] my helmet off, he would have recognized me, and none of it would have happened. I've known him for almost 10 years. He's always been in the community. To me he was a good guy. And it's unfortunate that that happened.

But when he did that, he looked over, his brother, Mr. Ramsey, was [lying] on the ground. And he reaches down and picks the gun up. I then squat in front of my bike. And I now have my gun -- I mean, my hand on

- 5 -

my gun. I'm telling him, "Don't pick it up. Don't pick it up." When he goes to pick it up, he starts shooting at me. The first bullet struck me in my right leg. I kind of went to the ground. Two more bullets struck the dashboard of my motorcycle. I have pictures of that here that I can share with you. I also have the pictures from the crime scene where the black pieces -- where the bullets hit my bike are right next to evidence markers that they didn't know went to that, so they're not in evidence, but they are in the evidence photos next to evidence markers.

> I returned fire, and -- and I shot six times. He was standing just like this, just like this towards me, and three of the bullets hit his right torso, underneath his armpit. Another bullet went straight down his arm because he's pointing at me. He's looking down the barrel of the gun. Another bullet scanned right across his face. I have those pictures here. And then he went down.

Defendant Tablack averred that he did not go to LongHorn with any intent of harming the victims, that he did not know why Mr. Ramsey had his gun out, and that he felt badly for the victims' families and wished the incident never occurred. He requested judicial diversion, noting that he had never been in trouble before.

Defendant Craft called Andrew Geltzer, a Certified Legal Investigator and a member of the "Outlaws Motorcycle Club." Mr. Geltzer said Defendant Craft explained that he initially "lied my face off to the cops" because I wanted to see my "six months old" son. Mr. Geltzer said Defendant Craft was released from custody the next day and that when Defendant Craft found out that there was a warrant for him, he turned himself in. He said Defendant Craft had served in the military for fifteen years, had been in combat multiple times, and had been trained in "urban combat" to de-escalate this type of situation. Mr. Geltzer stated the following about Defendant Craft's statement about what happened:

> To hear [Defendant Craft] explain it is astonishing. This is not a thug who went there to shoot someone. This is a guy who saw a firearm. He said to me, "I cleared my background." He gave me all the technical data. He said, I chose my firing sector. My hands came up. The firearm was out of my hands. I said "drop the weapon." I was smiling because we have non-English speakers. And he said I watched that shoulder and watched the background. If that shoulder comes up, I'm going to shoot because he's raising the gun. Well, he started to fire before he raised the gun. Mr. Craft showed me. He said, "I pulled out my gun, fired three shots. You'll find the bullets right here. The spacing should be two inches," I believe, is the phrase he used.

Mr. Geltzer said that Defendants were members of what was classified by the Department of Justice as a motorcycle club and not a criminal gang or street gang.

Defendant Craft gave an unsworn statement. He said that the three Defendants probably should have gone to trial and claimed self-defense. He said a "pistol [was] fired at me before I ever even drew my pistol from my side." He said there was a public "bias against our club" and statements made by the mayor and others that made them feel that they would not get a fair trial. He said that none of them wanted this to happen and that he was sorry that it did. Defendant Craft said that he should not have lied to the police but that he wanted to go home and see his son.

Defendant Davis declined to give an allocution or call witnesses.

The State entered separate presentence reports for Defendant Craft (Exhibit 1), Defendant Davis (Exhibit 2), and Defendant Tablack (Exhibit 3). Based on the information in Exhibit 1, Defendant Craft had two prior misdemeanor convictions—a 2016 conviction for driving under the influence and a 2011 conviction for reckless driving. He successfully completed probation on both offenses. Defendant Craft reported that he had completed sixty-seven hours towards an associate degree in general studies and hoped to complete a bachelor's degree with his G.I. Bill. He reported that he was a member of the Outlaw Motorcycle Club, but denied the club was a gang. He reported that he served in the United States Army from 2001 to 2004. He worked as a fireman from 2004 to 2007, and then re-enlisted in the army and served from 2007 to 2014. The Strong-R Report shows his risk level is high for violence. According to Exhibit 2, Defendant Davis had no prior criminal convictions. Defendant Davis has completed fifteen hours towards an associate degree. He served in the army from 2012 to 2019. After military service, he worked as a window installer until his arrest. Defendant Davis's Strong-R Report showed his risk level was low. According to Exhibit 3, Defendant Tablack had four minor traffic offenses and two same-day hunting violations.

Following argument, the trial court stated that it had considered the purposes of sentencing outlined in Tennessee Code Annotated sections 40-35-102 and 103. The court stated that it had also considered the principles of sentencing outlined in section 40-35-210, the evidence received at the sentencing hearing, the presentence reports in all three cases, the arguments of counsel, the nature and characteristics of the criminal conduct involved, the evidence and information offered by the parties on mitigation and enhancement factors, the statistical information as to sentencing provided by the Administrative Office of the Courts, the unsworn statements made by two Defendants to the court, and the risk and needs assessments in the presentence reports.

Relative to diversion, the trial court stated that it had reviewed and considered all of the *Electroplating* factors. *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). The court noted that Defendants were considered favorable candidates for alternative sentencing because they were convicted of Class C felonies.[2] Based upon "the special or general deterrence value," the court denied the request for judicial diversion by Defendants.

The court found that the following four enhancement factors listed in Tennessee Code Annotated section 40-35-114 applied to all three Defendants:

(2) Defendants were leaders in the commission of an offense involving two or more criminal actors;

(3) the offenses involved more than one victim;

(9) Defendants possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense; and

(10) Defendants had no hesitation about committing the crime when the risk to human life was high.

The trial court found that enhancement factor (6), the personal injuries inflicted were particularly great, did not apply because "that is an element of voluntary manslaughter."

The trial court found that mitigating factor (2) "could apply to all three defendants; that is, that there was strong provocation that's taken into the certain account that if the matter was tried that self-defense would be a defense by all three defendants." The court then stated, without further explanation, that mitigating factors 2, 3, or 11 did not apply to any Defendant and that the Defendants' military service was also not a mitigating factor.

Concerning the facts and circumstances of the offenses, the trial court stated that "there was, for lack of a better term, a shoot-out in the middle of a busy restaurant on one of the busiest roads in Clarksville, Tennessee." The court found that it was "a miracle that no one was hit at LongHorn, other than the two decedents." The court found that "confinement was necessary to be an effective deterren[t] of others likely to commit similar offenses." The court sentenced each of the Defendants to six years' incarceration in the Tennessee Department of Correction.

---

[2] Voluntary manslaughter was a Class C felony at the time of the offenses. Effective July 1, 2023, voluntary manslaughter became a Class B felony.

**Analysis**

On appeal, Defendants Davis and Tablack claim that the trial court erred by denying judicial diversion and by denying probation. All three Defendants claim that the court erred by imposing the maximum sentence. The State argues that the court acted within its discretion when it denied diversion, denied probation, and imposed a six-year sentence.

**Judicial Diversion**

The standard of review adopted in *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012), applies to judicial diversion. *State v. King*, 432 S.W.3d 316, 326 (Tenn. 2014). *Bise* did not, however, "abrogate[] the common law factors governing judicial diversion," as set forth in *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996), and *State v. Electroplating, Inc*., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). *Id*. When the trial court demonstrates that it considered and weighed the *Parker* and *Electroplating* factors, the presumption of reasonableness applies. *Id*. at 327. When the trial court fails to consider and weigh those factors, the presumption of reasonableness does not apply, and the appellate court has two options: (1) conduct a de novo review to determine whether there is substantial evidence for denying diversion; or (2) remand for the trial court to consider the common law factors in determining whether to grant or deny diversion. *Id.* at 327-28.

Tennessee Code Annotated section 40-35-313 governs judicial diversion and states that, upon a finding of guilt, the trial court may place a qualified defendant on probation without entering a judgment of conviction. Tenn. Code Ann. § 40-35-313(a)(1)(A) (2019). Once a defendant successfully completes probation, the charge will be dismissed. Tenn. Code Ann. § 40-35-313(a)(2). A defendant is a "qualified defendant" and eligible for judicial diversion if he or she is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony; has not been previously convicted of a felony or Class A misdemeanor for which a sentence of confinement has been served; has not been previously granted judicial or pretrial diversion; and is not seeking deferral for a sexual offense, a DUI, certain offenses against elderly or vulnerable adults, or vehicular assault. *See* Tenn. Code Ann. § 40-35-313(a)(1)(B)(i).

However, being qualified does not presumptively entitle a defendant to judicial diversion but simply allows the trial court to grant diversion to suitable defendants. *Parker*, 932 S.W.2d at 958. A defendant bears the burden of proving that he or she is a suitable candidate for judicial diversion. *State v. Gibson*, No. E2007-01990-CCA-R3-CD, 2009 WL 1034770, at *4 (Tenn. Crim. App. Apr. 17, 2009) (first citing *State v. Curry*, 988 S.W.2d 153, 157 (Tenn. 1999); and then citing *State v. Baxter*, 868 S.W.2d 679, 681 (Tenn. Crim. App. 1993)).

In this case, Defendants Davis and Tablack were eligible for judicial diversion because they pled guilty to voluntary manslaughter, which at the time was a Class C felony, they had no prior felonies or Class A misdemeanors, and they had not received diversion in the past.[3]

In determining whether to grant judicial diversion to a qualified defendant, the trial court must consider the following factors:

(a) the accused's amenability to correction;

(b) the circumstances of the offense;

(c) the accused's criminal record;

(d) the accused's social history;

(e) the accused's physical and mental health; and

(f) the deterrence value to the accused as well as others.

*Parker*, 932 S.W.2d at 958. In *Electroplating*, this court added as a factor that the trial court "*must*" consider and weigh: (g) "whether judicial diversion will serve the interests of the public as well as the accused." *Electroplating*, 990 S.W.2d at 229. In addition to the seven factors listed above, the trial court may consider the following factors in making its decision: "[the defendant's] attitude, behavior since arrest, prior record, home environment, current drug usage, emotional stability, past employment, general reputation, marital stability, family responsibility[,] and attitude of law enforcement." *State v. Anthony Adinolfi*, No. E2013-01286-CCA-R3-CD, 2014 WL 2532335, at *2 (Tenn. Crim. App. June 2, 2014) (quoting *State v. Washington*, 866 S.W.2d 950, 951 (Tenn. 1993)) (internal quotation marks omitted), *no perm. app. filed*.

In the instant case, the trial court's specific findings concerning its decision to deny judicial diversion are contained in a single paragraph:

> The [c]ourt does find that to the extent requested by any of [D]efendants for judicial diversion, the [c]ourt has reviewed the *Electroplating* factors and considered all factors and relying especially on factor 6, the special or general deterrence value, the [c]ourt will respectfully

---

[3] As mentioned above, effective July 1, 2023, voluntary manslaughter became a Class B felony.

- 10 -

deny any request for judicial diversion. The [c]ourt will make further findings in a moment as to why it believes that that would not be appropriate.

Although the trial court did not mention "judicial diversion" in its findings concerning the manner of service of the sentence, the trial court stated:

> [I]t's a miracle that no one was hit at LongHorn, other than the two decedents.

> The [c]ourt, considering the facts in this case and circumstances, including the fact that there was, for lack of a better term, a shoot-out in the middle of a busy restaurant on one of the busiest roads in Clarksville, Tennessee, finds the confinement is necessary to be an effective deterrence of others likely to commit similar offenses.

"The circumstances of the offense" and "the deterrence value to the accused as well as others" are common law factors specifically listed in *Parker* and *Electroplating* that a trial court can consider in determining the suitability of a defendant for diversion. In reaching its decision to deny judicial diversion, a trial court is not required to recite on the record all of the *Parker* and *Electroplating* factors; however, the record should reflect that the trial court considered all of the factors in rendering its decision and that it "identified the specific factors applicable to the case before it." *King*, 432 S.W.3d at 327. The trial court stated that it considered all the factors and identified the applicable factors. We determine that the trial court's decision to deny diversion is entitled to a presumption of reasonableness and that the court did not abuse its discretion in denying the request for judicial diversion made by Defendants Davis and Tablack.

### Length of Sentence

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2022).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e); *Bise*, 380 S.W.3d at 706. Although the trial court should consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2022); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *Carter*, 254 S.W.3d at 346. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2022), Sentencing Comm'n Cmts.

The trial court applied enhancement factor (2), "[t]he defendant was a leader in the commission of an offense involving two [] or more criminal actors"; (3) "[t]he offense involved more than one [] victim"; (9) "[t]he defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense"; and (10) "[t]he defendant had no hesitation about committing a crime when the risk to human life was high applied to all three defendants. Tenn. Code Ann. § 40-35-114.

Concerning possible mitigating factors, it is unclear whether the trial court intended to apply mitigating factor (2). The court initially stated that enhancement factor (2) "could apply" to all three Defendants but then, without further explanation, stated that it does not find mitigating factor (2) applied to Defendants. The court next found that mitigating factors (3), (11) and (13) did not apply.

Defendants argue that the trial court erred in applying enhancement factors (2) and (3) because there was no evidence to demonstrate that any one of them had a "leadership" position and there was only one victim in each count of voluntary manslaughter, and the

- 12 -

court applied too much weight to enhancement factors (9) and (10). Defendants also claim that the trial court erred by not applying mitigating factor (2) because they acted under strong provocation, mitigating factor (3) because substantial grounds existed tending to excuse or justify their conduct, and mitigating factor (11) because the offenses were committed under such unusual circumstances that it is unlikely that there was a sustained intent to violate the law. Defendant Craft claims that the court should have applied mitigating factor (13) because of his military service. Defendant Davis claims that in his case the trial court should have also applied mitigating factor (4) because he did not shoot any of the victims and therefore played a minor role in the commission of the offenses and mitigating factor (13) because of his multiple tours of duty and lack of a criminal record. Finally, Defendants claim that the court imposed an excessive sentence.

The State concedes that the language of Tennessee Code Annotated section 39-13-211(a) "makes clear that there cannot be multiple victims for any one offense of voluntary manslaughter" and that the trial court erred in its application of enhancement factor (3). We agree. We also find that the proof presented at the sentencing hearing was insufficient to establish that any one or more of the Defendants was a leader of an offense that involved two or more criminal actors. We recognize that two or more criminal actors may be leaders in the commission of an offense and that enhancement factor (2) does not require proof that a defendant was "the sole leader but only that the defendant be 'a' leader." *State v. Hicks*, 868 S.W.2d 729, 731 (Tenn.Crim.App.1993). Nevertheless, there was no evidence presented that any Defendants planned the "shootout" at LongHorn, that the Defendants acted in concert, or that any Defendants directed the actions of the other Defendant or Defendants. The trial court erred in applying enhancement factor (2).

Initially, we recognize that Defendants have the burden of proving the applicability of mitigating factors. *State v. Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App., at Knoxville, Sept. 18, 1995). We agree with Defendants that the proof supported the application of mitigating factor (2). We also agree with Defendants' argument that the trial court failed to specifically address the reasons that the other mitigating factors did not apply. However, we emphasize that a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. In addition, the weight given to an enhancement or mitigating factor is within the sound discretion of the trial court. *Carter*, 254 S.W.3d at 345.

The sentencing range for a Range I offender convicted of a Class C felony is three to six years. Tenn. Code Ann. § 40-35-112(a)(3) (2022). In this case, the trial court considered the purposes and principles of sentencing and articulated its reasoning for imposing a within-range six-year sentence on the record, specifically discussing the

extreme danger to innocent people caused by the shoot-out. The trial court's decision is presumptively reasonable. *Bise*, 380 S.W.3d at 707.

## Probation

Probation is "a privilege" or "an act of grace" which may be granted to an accused who is eligible and "worthy of this largesse." *Stiller v. State*, 516 S.W.2d 617, 619-20 (Tenn. 1974). A defendant who is statutorily eligible for probation, pursuant to Tennessee Code Annotated section 40-35-303(a), has the right to "a full and fair evidentiary hearing and the right to all the procedural requirements contained in or necessarily contemplated by the statutory scheme." *Id*.

In determining whether a sentence of confinement is appropriate, the trial court should base its decision on the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1) (2022).

Our supreme court has stated that the guidelines "applicable in determining whether to impose probation are the same factors applicable in determining whether to impose judicial diversion." *State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017) (quoting *State v. Scott*, No. M2010-01632-CCA-R3-CD, 2011 WL 5043318, at *11 (Tenn. Crim. App. Oct. 24, 2011)). "Those factors include (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value. *See* [*Electroplating*, 990 S.W.2d at 229]." *Id.*

The same abuse of discretion with a presumption of reasonableness standard used to review the length of a sentence and consecutive sentencing also applies to "questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). "*Bise* specifically requires trial courts to articulate the reasons for the sentence in accordance with the purposes and principles of sentencing in order for the

- 14 -

abuse of discretion standard with a presumption of reasonableness to apply on appeal." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013) (citing *Bise*, 380 S.W.3d at 698-99); *see Trent*, 533 S.W.3d at 292.

In this case, Defendants Davis and Tablack were eligible for alternative sentencing because the sentence imposed was ten years or less and because voluntary manslaughter was not an offense made statutorily ineligible for probation. Tenn. Code Ann. § 40-35-303(a) (2022). Even though eligible for probation, Defendants Davis and Tablack had the burden of establishing that they were suitable candidates for probation and the burden to demonstrate "that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).

Additionally, Defendants Davis and Tablack, because they were Range I standard offenders convicted of Class C felonies, were favorable candidates for alternative sentencing options, in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6)(A) (2022). However, "[a] court shall consider, but is not bound by, the advisory sentencing guideline in this subdivision (6)." Tenn. Code Ann. § 40-35-102(6)(D) (2022).

The trial court stated on the record that it had considered the purposes and principles of sentencing. Based upon the facts and circumstances of the offenses, the trial court found that confinement was necessary to serve as an effective deterrent to others likely to commit similar offenses. *See* Tenn. Code Ann. § 40-35-103(1)(B). In addition, the trial court also discussed the seriousness of the offenses and the extreme danger in which Defendants Davis and Tablack placed other people in by participating in the shoot-out. *See id.* The trial court articulated its reasons for denying probation on the record and did not abuse its discretion in ordering Defendants Davis and Tablack to serve their sentences in confinement. We cannot conclude that the trial court abused its discretion by denying probation. Defendants Davis and Tablack are not entitled to relief on this basis.

## Conclusion

We conclude that the trial court did not abuse its discretion by ordering the maximum in-range sentence. The judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 15 -